## HOUSTON & T. C. R. CO. v. BRIGHT.

(Court of Civil Appeals of Texas. Galveston. March 25, 1913. Rehearing Denied April 17, 1913.)

1. MASTER AND SERVANT (§§ 87, 228*)—LIABILITY FOR INJURIES — STATUTORY PROVISIONS—CONTRIBUTORY NEGLIGENCE.

Employer's Liability Act 1909 (Rev. Civ. St. 1911, art. 6648) § 1, providing that every corporation, receiver, or other person operating a railroad shall be liable in damages to any person suffering injury while "employed by such

carrier operating such railroad," applies to all employés of railroad companies, and not to those only who are actually engaged in the operation of railway trains or cars, since the words "operating any railroad" apply to the word "carrier" and not to the word "employed," and hence in an action for injuries to an employé of a railroad company sustained while working on a railroad bridge the court properly charged as provided in section 2 (Rev. Civ. St. 1911, art. 6649) that contributory negligence would merely reduce and not defeat a recovery.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 138, 670, 671; Dec. Dig. §§ 87, 228.*]

2. MASTER AND SERVANT (§ 87*)—CONSTITUTIONAL LAW (§ 245*)—LIABILITY FOR INJURIES—STATUTORY PROVISIONS.

Employer's Liability Act 1909 (Rev. Civ. St. 1911, art. 6648) § 1, providing that every corporation, receiver, or other person operating a railroad shall be liable in damages to any person injured while "employed by such carrier operating such railroad," construed to apply to all employés of railroad companies whether engaged in the operation of trains or cars or not, does not deny railroad companies the equal protection of the laws in violation of Const. U. S. Amend. 14.

[Ed. Note.—For other cases. see Master and Servant, Cent. Dig. § 138; Dec. Dig. § 87;* Constitutional Law, Cent. Dig. § 702; Dec. Dig. § 245.*]

3. COMMERCE (§ 8*)—RAILROADS—STATUTORY PROVISIONS.

Employer's Liability Act 1909 (Rev. Civ. St. 1911, art. 6648 et seq.), making corporations, receivers, or other persons operating railroads liable to employés for injuries received through the negligence of the employer or its officers, agents, or servants, is not an invalid interference with interstate commerce, that being a subject relative to which the states may act until Congress has acted, but is inoperative in so far as it affects interstate commerce while the federal statute remains in force.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 5; Dec. Dig. § 8.*]

4. APPEAL AND ERROR (§ 1003*)—REVIEW—QUESTIONS OF FACT.

The Court of Civil Appeals cannot set aside a verdict which is against the great preponderance of the testimony unless the preponderance is such as to indicate prejudice, passion, or other improper motive.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3938–3943; Dec. Dig. § 1003.*]

5. RELEASE (§ 58*) — EVIDENCE — QUESTIONS FOR JURY.

In an action for personal injuries, where the evidence tended to show that defendant's chief surgeon in charge of a hospital to which it customarily sent its injured employés told plaintiff, at a time that defendant's claim agent was trying to effect a settlement, that his injuries consisted only of a common sprain and that he would be as well as ever and able to work in three weeks or a month, that this statement was not true, plaintiff's injuries being serious and permanent, but that it was believed by plaintiff and induced him to make the settlement, and that defendant's claim agent used such statement to procure a release of plaintiff's claim, although he knew from information furnished him by another physician that plaintiff's injuries were more serious than stated by the chief surgeon, it was a question for the jury whether plaintiff was bound by the release, even though the chief surgeon believed his statement was true, since if the claim agent used it to ef-

fect a settlement with knowledge that it was not true he was guilty of fraud.

[Ed. Note.—For other cases, see Release, Cent. Dig. §§ 109–114; Dec. Dig. § 58.*]

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

Action by W. W. Bright against the Houston & Texas Central Railroad Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Baker, Botts, Parker & Garwood, Lane, Wolters & Storey, and Wm. A. Vinson, all of Houston, for appellant. John Lovejoy and Presley K. Ewing, both of Houston, for appellee.

McMEANS, J. W. W. Bright brought this suit against the Houston & Texas Central Railroad Company to recover damages for personal injuries sustained by him while in the defendant's employment as a bridge worker. Liability was predicated upon the alleged negligence of defendant in failing to furnish to plaintiff a clawbar that was reasonably safe for use, and in furnishing one that was defective. The defendant answered by general denial, pleas of assumed risk and contributory negligence, and further specially alleged that on July 13, 1909, prior to the institution of this suit, the plaintiff and the defendant agreed upon a full settlement of plaintiff's cause of action, and the defendant thereupon paid to the plaintiff the sum of $195, which he received and accepted in full settlement, satisfaction, and discharge of his cause of action set forth in the petition, and of all damages sustained by him; that on said date the plaintiff, by written instrument, released the defendant from all claims, demands, and causes of action which had accrued, or might thereafter accrue, and for all damages of whatsoever nature received in or resulting from the accident alleged to have been sustained by him. By supplemental petition the plaintiff alleged that the contract of settlement was not binding upon him, for the reason that Dr. S. C. Red, the defendant's physician, represented to the plaintiff, the day after he was hurt, and prior to the settlement, that the injury suffered by him consisted simply of a common sprain of his ankle, and that he would be as well as ever, and out at work in a month, and that his injuries were not as great as they really were; that the representation was false, the fact being that the plaintiff was seriously and permanently injured, of which fact said physician knew, and ought, in the exercise of ordinary care and skill, to have known, but of which the plaintiff was ignorant; that as an inducement to plaintiff to make the release, the defendant's claim agent repeated to the plaintiff, in substance, the representations made by said physician, and the plaintiff, believing such representations to be true, and relying

thereon, was thereby induced to make the settlement which otherwise he would not have made; that said claim agent and said physician were acting together, and the claim agent used the physician to deceive the plaintiff as to his condition, in order to make an advantageous settlement with him. The plaintiff tendered into court and offered to restore the consideration received by him for the release, or to have it deducted from his recovery. A trial before a jury resulted in a verdict and judgment for plaintiff for $2,-500. Defendant's motion for a new trial having been overruled, it has appealed.

[1] The court in its general charge instructed the jury on the issue of contributory negligence as follows: "Should you find that defendant was negligent towards plaintiff as before submitted, and that such negligence was a proximate cause of alleged injuries to him, but should you believe from the evidence that plaintiff failed in some manner to exercise ordinary care, as before defined, for his own safety in failing to properly place or adjust the clawbar under the head or about the spike, or in otherwise handling said clawbar, and that he thereby contributed to alleged injuries of which he complains, then you will diminish the damages, if any, in proportion to the amount of negligence you find attributable to the plaintiff." This charge is assailed by appellant's first assignment, its first proposition thereunder being as follows: "It appearing from the undisputed evidence that the appellee, at the time of his injury, was not engaged in operating appellant's railroad, it was affirmative error to instruct the jury that if they found the plaintiff contributorily negligent to diminish the damages in proportion to the amount of negligence attributable to him, instead of returning a verdict, in such event, for the defendant."

The evidence raised the issue of plaintiff's contributory negligence sufficiently to require the submission of that issue to the jury.

As we understand appellant's contention, it is that the benefits of what is commonly known as the Employer's Liability Act, under which the suit was brought (General Laws 1909, p. 279; Rev. St. 1911, art. 6648), are intended only for those servants of a corporation, receiver, or other person, operating a railroad, who at the time of injury are engaged in the operation of the railroad, and that as the plaintiff at the time he was injured was working on a bridge, and not engaged in the operation of the railroad, the benefits of the statute did not extend to him. The statute, in so far as it affects the question under consideration, is as follows: "That every corporation, receiver, or other person operating any railroad in this state, shall be liable in damages to any person suffering injury while he is employed by such carrier operating such railroad."

Appellant contends that the word "such"

before "carrier" fully describes the persons amenable to the act, and that if the words "operating such railroad" also refer to the carrier, and not to the class of employés, that such words are a needless tautology, an idle repetition, and perform no office whatsoever in the act. In support of the contrary contention, appellee urges that there is not even a claim of ambiguity in the act, but of redundancy only, and that appellant's is answered by a recent ruling of the Supreme Court of the United States in Southern Railway Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72, where, in considering the scope of the Federal Safety Appliance Act, a similar point was denied. We are saved the labor of discussing the question of construction of the statute, raised by the proposition, as that statute has already been construed in this state, and adversely to appellant's contention. In Railway Company v. Jenkins, 137 S. W. 711, the Dallas Court of Civil Appeals, having before it the precise question here raised, says: "The undisputed evidence is that appellee was a boiler maker helper to C. A. Oglesby, a boiler maker, both being in the employ of appellant, and that Oglesby was intrusted with authority to direct and superintend appellee in the work they were doing. * * * Section 1 of said act, so far as need be quoted, reads: 'That every corporation, receiver or other person operating any railroad in this state shall be liable in damages to any person suffering injury while he is employed by such carrier operating such railroad.' Appellant contends that this section of the act indicates that its provisions are applicable only to those employés of a railway company who are, when injured, actually engaged in the operation of a railway train or cars. We do not concur in this construction of the statute. The statute does not make the railway company liable only for an injury suffered by the employé while he is engaged in the work of operating its trains or cars, but also for an injury received in the discharge of the duties required of him while employed by such company. It is manifest, we think, that it was the intention of the Legislature to apply the words 'operating any railroad' to the word 'carrier,' and not, as seems to be the contention of appellant's counsel, to the word 'employed.' Indeed, as the sentence is constructed, it does apply to the word 'carrier,' and can have reference to no other word therein." A writ of error was denied by the Supreme Court in that case.

By the authority of this decision we must overrule the proposition under discussion.

[2] By its second proposition under the first assignment appellant asserts that: "If it be held that the statute in question applies to all employés of a railroad company, in whatever department of its service they may be engaged, then the act is in violation of the fourteenth amendment to the Constitu-

tion of the United States, in that it denies to railroad companies the equal protection of the law, and is therefore void."

This precise question was also ruled upon in the case of Railway Company v. Jenkins, above cited, and a similar contention to that here made was denied; the court saying: "The statutes referred to are not violative of the equal protection clause of the fourteenth amendment of the federal Constitution. They are applicable to all persons of a particular class, affecting alike the employés of all corporations or persons owning or operating a railroad, when brought under their influence under like circumstances and conditions.' Railway v. Bailey, 53 Tex. Civ. App. 295, 115 S. W. 606; Railway v. Smith, 45 Tex. Civ. App. 128, 99 S. W. 743; Railway v. Grothe, 88 Tex. 262, 31 S. W. 198; Railway v. Richardson, 125 S. W. 624; Railway v. Melton, 218 U. S. 36, 30 Sup. Ct. 676, 54 L. Ed. 921; Railway v. Turnipseed, Adm'r., 219 U. S. 35, 31 Sup. Ct. 136, 55 L. Ed. 78, 32 L. R. A. (N. S.) 226, Ann. Cas. 1912A, 463. * * * That said act is not void as being in violation of the fourteenth amendment to the Constitution of the United States, but, like the Federal Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65, U. S. Comp. St. Supp. 1909, p. 1171), abrogates the common-law doctrine of fellow servant as to employés of a corporation operating a railroad, is well settled by the decisions above cited, of the courts of this state, and of the Supreme Court of the United States."

The point presented by the second proposition cannot be sustained.

[3] By a third proposition under its first assignment of error appellant contends that "the act of the Legislature of the state of Texas, approved April 13, 1909, entitled 'An act declaring corporations, receivers, or other persons operating railroads in this state, to be liable to employés for injuries received through the negligence of such employer, officer, agent or servant,' etc., upon which the paragraph of the court's charge complained of is based, is void, because in conflict with the commerce clause of the Constitution of the United States, and the Federal Employer's Liability Act upon the same subject."

The petition alleges, and the proof shows, that the plaintiff was injured while engaged in repairing a bridge on a spur track on defendant's railroad, and in the course of his employment as a bridge carpenter. There is nothing in the pleadings or proof to indicate that the plaintiff was engaged in interstate commerce, or that he was employed in such commerce; but the evidence shows that he was not so engaged.

We are of the opinion that the contention raised by the third proposition must be overruled, for that precise question has also been settled in this state adversely to defendant's contention. In Freeman v. Swan, 143 S. W. 724, the El Paso Court of Civil Appeals, in disposing of a similar contention, says: "Said state statutes regulating the relation of master and servant are applicable to those engaged in interstate commerce until Congress has acted. Sherlock v. Alling, 93 U. S. 99, 23 L. Ed. 819; M. P. Ry. v. Mackey, 127 U. S. 208, 8 Sup. Ct. 1161, 32 L. Ed. 107; Railway v. Herrick, 127 U. S. 210, 8 Sup. Ct. 1176, 32 L. Ed. 109. The state statute, then even if we construe it as undertaking to cover cars in every service, interstate as well as intrastate, is unquestionably valid, as against this objection, until Congress has acted. When Congress does act, as it has done, the result is simply to limit the application of the state statute to cars in intrastate service." A writ of error was refused by the Supreme Court in that case. M., K. & T. Ry. Co. v. Turner, 138 S. W. 1126, is to the same effect; it being there held: "If it should be conceded that the state statute should be construed as an attempt to regulate interstate commerce, we do not think it should for that reason be held to be invalid, but think it should be held to be merely inoperative—in so far as it affects interstate commerce—while the federal statute remains in force. In the absence of a federal statute covering the subject, the state would clearly have power to cover it by enactments of its own. For the subject is not one over which it can be said the power of Congress in exclusive, in the sense that the states are without power to act with reference to it, notwithstanding inaction with reference thereto on the part of Congress. Covington v. Kentucky, 154 U. S. 209, 14 Sup. Ct. 1087, 38 L. Ed. 962; 7 Cyc. 422. If the federal statute should be repealed and the state statute should not be, clearly on the repeal of the former the latter would become operative. Henderson v. Spofford, 59 N. Y. 131; 7 Cyc. 421; 17 A. & E. Enc. Law (2d Ed.) 55; 57, 59. That such a result would follow under the circumstances stated proves that the state is not without power to enact, though for the time being it is without power to enforce, such a statute."

It follows, therefore, that the court properly followed the second section of the statute here assailed in submitting the issue of contributory negligence. The statute is as follows: "Sec. 2. That in all actions hereafter brought against any such common carrier by (or) railroad under or by virtue of any of the provisions of this act to recover damages for personal injuries to any employé, * * * the fact that the employé may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé. * * *"

Appellant's first assignment of error is overruled, as is also the second assignment,

which complains of the refusal of the court to give the jury its special charge instructing the jury, in effect, that if they found from the evidence that appellee was contributorily negligent to return a verdict for defendant. By its third assignment of error appellant contends that the court erred in not granting to it a new trial because the undisputed proof shows that plaintiff for a valuable consideration executed a release of all claims for damages which he had or which might thereafter accrue, growing out of the injuries sustained by him, and which damages he was seeking to recover in this suit. By its several propositions under this assignment, appellant contends that the great preponderance of the evidence establishes the following facts: That after the happening of the accident the plaintiff voluntarily, and with the same means of knowledge as those possessed by appellant, executed a release of all claims for damages which he had, or which might thereafter accrue; that the defendant's physician did not, prior to the settlement make any statement or representation to plaintiff as to the nature and extent of his injuries, but that if said physician did make any statement or representation to him in regard to the extent of his injuries, then the same was made in good faith, and constituted the honest medical opinion of said physician, and was not made for the purpose of inducing a settlement; that defendant's claim agent, at the time of making said settlement with plaintiff, made no representation or statement to plaintiff as to the opinion of defendant's surgeon as to the nature and extent of his injuries, but that if he did, said statements were made in good faith, in the honest belief that the same were true.

The evidence shows that the plaintiff's feet were seriously and permanently injured by a fall from a bridge upon which he was at work. He was at once taken to a hospital or infirmary where the appellant customarily sent its injured employés, and his wounds dressed and bandaged by Dr. Record, the hospital surgeon. Dr. C. S. Red was then the chief surgeon of appellant, and together with Dr. Stuart had control of the hospital or infirmary. About 1 o'clock on the next day appellant's claim agent, J. W. Given, went to the hospital and opened negotiations with plaintiff for a settlement of his claim against appellant for his injuries, offering him a month's time, $65, which plaintiff refused. Plaintiff declined at that time to make any settlement, stating that he did not know how badly he was injured and had not been advised in this regard by the physician in charge, and that all he wanted was what was right, and he thought it would be right to let his time run on until the doctor said he was able to go to work, when Given, according to plaintiff's testimony, replied: "The doctor says there is nothing the matter with your feet, only just a common sprain. You will be all right in a little while." The claim agent then left, and returned about 5 o'clock that afternoon and resumed the talk of settlement, when plaintiff repeated what he had said at the previous meeting, to which Given replied: "We would rather make a settlement and be done with it." Plaintiff testified that just about this time Dr. Red came into the room and asked him how his feet were getting along; that this was Dr. Red's first visit to him; that Dr. Red felt of his feet, but did not unwrap them; and that when he got through feeling of them "it felt like he was going to pull them off, it hurt so bad, and I asked him, 'Doctor, what do you think about it? * * *' and he says, 'Nothing but a common sprain, no broken bones, or anything of the kind,' and I says, 'How long do you think it will take them to get well?' and he says, 'About three weeks, possibly a month,' and I says, 'Do you really think they will, Doctor?' and he says, 'Yes, I know they will be all right.' He says, 'You will be able to go to work in a month's time, do anything you ever done,' and then he walked on." Plaintiff further testified: That Given was present while Dr. Red was making these statements. That when Dr. Red went out, Given said, "Excuse me a moment, I want to speak to Dr. Red," and that he went out staying about possibly five minutes, and returned; witness not knowing what was said between them. That when Given returned he increased his offer from $65 at the first conversation to $175, which plaintiff refused, but then agreed to take $195, being three months' time, thinking under the doctor's statements that he would certainly be well by that time. That when Given came back, he reminded plaintiff of what the doctor had just said about his being well in a month, being the same statement he made at the first conversation as to what the doctor had said. That if he had not believed the statement to be true he would not have made the settlement, would not have signed the release. That when Dr. Red made said statements to him, the bandages were not off, but that Dr. Red afterwards, during the same week, saw the wounds with the bandages off. The statements testified to as made by Dr. Red and Given were reiterated on cross-examination.

Charles E. Carr, who was present when Given first called, testified: "Mr. Given told him the doctor did not think his injuries would amount to very much, as well as I remember"—on cross-examination the witness saying: "I said Mr. Given said the doctor said he did not think his injuries would amount to very much; he didn't say what doctor said that; he just said the doctor said that."

Dr. Red testified that he had no recollection of Bright's case, only he knew from his face he had seen him somewhere, but stated

that from his habit he would not give an opinion of a man's injury without an examination, and that if he gave an opinion at all it would be an honest opinion, and not a false one, for the purpose of effecting a settlement. On cross-examination he testified: "It is true that on many occasions my assistants have told me about this or that patient, and his injuries, many times; that is a fact, and of course I would assume they had diagnosed their injuries correctly, in many cases. If they (my assistants) reported to me the injury was not serious, I would assume their report was correct." He testified that, while he had no recollection of Bright's case, "I go in and talk to the patients, of course; that is my business. I remember of talking to patients in the presence of Mr. Given; I have talked to people in Mr. Given's presence. That has not frequently happened; it has happened." That he had no recollection of Given notifying him in plaintiff's case to be at the hospital at a certain time, "but I have a recollection in other cases he has notified me he wanted me to be there; he has done that." Again: "As to whether I have ever, in Given's presence, told a patient what his condition was if the patient asked me, or if Given would ask me—if I was there, it was to give Mr. Given an opinion as to what was the condition of the patient; that is the idea, that is exactly what I was there for." That the employés were paying 50 cents a month for hospital service, but that he did not consider himself as much their doctor as the railroad company's doctor, and that he was employed by the railroad for the purpose of treating their sick and injured; and had nothing to do with the fund paid by the employés, and that it was optional with him whether he would give a man lying there in the hospital any advice or information, but that he would always tell him, though optional with him to do so, if he thought the information would not be injurious to him. That he would not have given plaintiff an opinion on such superficial examination as merely taking hold of and feeling and pulling at bandaged ankles and feet. Finally: "The day after he was hurt I could not have represented to him that he would be all right in a month, when that representation was false; I couldn't give a man an opinion on something I didn't know; if I hadn't examined him, I wouldn't have an opinion."

Given testified, in contradiction of plaintiff's testimony as to the statements upon which the release was obtained, that on his way to plaintiff's ward at the hospital, he talked with Dr. Record, and asked about plaintiff's condition, saying: "Before I went to see Bright, I already knew from Dr. Record what he thought about Bright's injuries. I did not talk to any other doctor about his injuries. I did not see any other doctor about his injuries. Dr. Record told me Bright had a badly sprained ankle, and possibly a fractured bone, but he could not tell. I do not recall that I told Bright when I was talking to him about a settlement what the doctor had told me." This was, in effect, reiterated on cross-examination; the witness saying: "I knew the condition of his (Bright's) leg from what Dr. Record told me; I knew what he thought."

Dr. Record was not called as a witness.

The release relied upon to defeat a recovery by plaintiff was introduced in evidence by defendant, and is as follows: "In consideration of the sum of one hundred and ninety-five dollars ($195.00) to me this day paid by the Houston & Texas Central Railroad Company, I hereby release said company from all claims, demands and causes of action against it which have accrued, or may hereafter accrue, to _____ for all damages of every nature whatsoever, received in, and resulting from, an accident at or near Houston, Texas, on or about July 12, 1909, in which W. W. Bright was injured by falling from White Oak Bayou bridge, upon which I was working in the capacity of bridge carpenter. Said sum is accepted by the undersigned in settlement for all damages, injuries and disabilities, which may hereafter result from said accident, as well as for those now known to have been caused thereby. It is expressly understood and agreed that said sum is paid and accepted not only for time and wages lost, expenses incurred, and property damaged and destroyed, but also in full and final settlement of all claims of every nature caused by said accident. To secure this settlement and the payment of said sum I hereby represent to said company that I am twenty-one years of age, and that I rely wholly upon my own judgment, belief and knowledge of the nature, extent and duration of said injuries, disabilities and damages, and that no representations or statements about them, made by said company's surgeons or agents, have influenced me in making, nor induced me to make, this settlement. No promise of employment nor other agreement not herein expressed has been made by said company, nor by any of its officers, agents or employés. Witness my hand at Houston, Texas, July 13, 1909. [Signed] W. W. Bright." This release was acknowledged by plaintiff, the usual form of acknowledgment of a deed followed to which is added "that he has read it (the release), fully understands its meaning and effect, and knows that it is an unconditional release in full, and that he voluntarily executed it as such." The plaintiff's signature to the release was witnessed by Fred D. Carstens and R. A. Hudson, and these attesting witnesses made affidavit at the time that the release was read aloud by the notary in their presence and hearing, and that plaintiff "stated to us that he fully understood its meaning and effect, knew that it was an unconditional

release in full, and voluntarily executed it for the purposes and consideration therein expressed." It was shown that the release was prepared by defendant's claim agent, Given.

That the injuries from which plaintiff was suffering at the time of the negotiations for a settlement were pending were not a common sprain, from which he could have recovered in from three weeks to a month, but that they were serious and permanent, is shown by the testimony of Dr. Gavin Hamilton. "This foot here—he has got practically no arch to his foot at all—you can see here, comes right down almost flat on the table; this one also; and this foot, the right foot, has the lesser of that, has diverted some, it is not in a proper line with the leg, so when he bears weight on that, the tendency of that foot is to pull out like that every time he steps on it; it draws on the ligaments and stretches them; that results from the breaking down of the ligaments and the dislocation of the small bones in the foot; I refer to the tarsal bone; those ligaments are simply broken down and dislocated to the point you can see the declivity, can see the deformity in the foot, and destroys the arch of the foot so he cannot stand on his foot any length of time without producing pain, and carrying heavy weight, anything like that, lifting, would tend to make the injury worse; it disables him from doing manual labor where he would have to be on his feet all the time; and an injury of that kind is permanent; it is an injury that cannot be remedied; it is a serious injury, so far as his ability to work is concerned; it has nothing to do with his life, anything of that kind."

[4] This court has no authority to set aside a verdict against the great preponderance of the testimony unless the preponderance is such as to indicate prejudice, passion, or other improper motive. As said by this court in Railway v. Rowell, 45 S. W. 766: "It may be that the preponderance of the evidence is against the verdict; but, if so, it is not such preponderance as would authorize us to set it aside. Appellate courts should not substitute their judgment upon the facts for that of the jury unless the verdict be without legal support, or is so manifestly against the evidence as to show unmistakable prejudice or sympathy." To the same effect are Railway v. Holland, 27 Tex. Civ. App. 397, 66 S. W. 68, and Railway v. Lee, 69 Tex. 560, 7 S. W. 324. In the case last cited our Supreme Court says: "It is not necessary for us to say what our conclusion would be as to the facts if called to pass upon them in the first instance. Where there is not sufficient evidence to sustain a verdict, this court will reverse the judgment; but, if there be sufficient evidence, it cannot interfere merely because we think the weight of the affirming testimony is against it." The rule being as above stated, it is only necessary for this court to examine the record to ascertain whether the evidence was sufficient to sustain the verdict upon the issue raised, and, if sufficient, the verdict should be upheld, notwithstanding we might have reached a different conclusion had we been called to pass upon the facts in the first instance.

[5] The jury had the right to conclude from the testimony of the plaintiff that Dr. Red, appellant's chief surgeon, represented to plaintiff, at a time that Given, the claim agent, was present and trying to effect a settlement with him, that plaintiff's injuries consisted of only a common sprain, and that he would be as well as ever and could do any work he had ever done in three weeks or a month, and that this statement was not true, because the injuries were serious and permanent, but the statement was believed by plaintiff to be true and he was induced thereby to make the settlement, which he otherwise would not have made. It may be conceded without in the least changing the result that Dr. Red, if he made the statement, believed his diagnosis and prognosis were correct, but if he made the statement at all he did so after such a superficial examination as to not lead to a discovery of the real injury. It was after this statement was made to plaintiff and after the claim agent had retired from the room to consult further with Dr. Red, and had returned, that the plaintiff agreed to the settlement and signed the release offered in evidence. When Given returned to plaintiff, he repeated what Dr. Red had said, although at that time he knew from the statement of Dr. Record, the hospital physician, as he himself testified, that plaintiff had "a badly sprained ankle and possibly a fractured bone." When Given, both before and after the visit of Dr. Red, knew that the statement made by Dr. Red, as testified by plaintiff, was not in fact true, he having been apprised by Dr. Record that the injuries were serious, yet nevertheless used Dr. Red's statement as a means of deception to procure by the release an advantageous settlement in favor of the defendant, he practiced a fraud upon plaintiff which tainted the transaction and rendered the contract of settlement void. Railway v. Huyett, 49 Tex. Civ. App. 395, 108 S. W. 502; 20 Cyc. 31, 32.

The case of El Paso & Southwestern Co. v. Kramer, 141 S. W. 122, relied upon by appellent, is not in conflict with the opinion here expressed. In that case the court expressly held that the evidence showed that the statements made by the defendant's physician to Kramer upon which he relied in making settlement were not tainted with fraud, not made for the purpose of inducing a settlement, but were medical opinions delivered in good faith. That case, upon the reasoning of the court, in fact upholds the conclusions we have here reached.

The record disclosing no reversible error, the judgment of the court below must be affirmed.

Affirmed.